MARSHALL, Ch. J.,
 

 delivered the opinion of the court. — The counsel for the appellant objects to the decree of the circuit
 
 *88
 
 court oa two grounds. He contends, 1. That this power of attorney does, by its own operation, entitle the plaintiff, for the satisfaction of his debt, to the interest of Rousmanier in the Hereus and the Industry. 2. Or, if this be not so, that a court of chancery will, the conveyance being defective, lend its aid to carry the contract into execution, according to the intention of the parties.
 

 1. We will consider the effect of the power of attorney. This instrument contains no words of conveyance or of assignment, but is a simple power to sell and convey. As the power of one man to act for another, depends on the will and license of that other, the power ceases, when the will, or this permission, is withdrawn. The general rule, therefore, is, that a letter of attorney may, at any time, be revoked by the party who makes it; and is revoked by his death. But this general rule, which results from the nature of the act, has sustained some modification. Where a letter of attorney forms a part of a contract, and is a security for money, or for the performance of any act which is deemed valuable, it is generally made irrevocable, *n terms> or ^ not so; is deemed irrevocable in *law. 2 Esp. 565. Although a letter of attorney depends, fx-om its natui-e, on the will of the person making it, and may, in general, be recalled at his will; yet, if he binds himself, for a consideration, in terms, or by the nature of his contract, not to change his will, the law will not peimit him to change it. Rousma-nier, thei-efore, could not, during his life, by any act of his own, have revoked this letter of attorney. But does it retain its efficacy after his death? We think, it does not. We think it well settled, that a power of attorney, though iri’evocable during the life of the party, becomes extinct by his death.
 

 This principle is asserted in Littleton (§ 66), by Lord Coke, in his commentary on that section (52
 
 b),
 
 and in Willes’ Reports (105 note, and 565). The legal reason of the rule is a plain one. It seems founded on the
 
 presumption,
 
 that the substitute acts by virtue of the authority of his principal, existing at the time the act is performed ; and on the manner in which he must execute his authority, as stated in
 
 Combes’ Case,
 
 9 Co. 166. In that case, it was resolved, that “when any has authority, as attorney, to do any act, he ought to do it in his name who gave the authority.” The reason of this resolution is obvious. The title can, regularly, pass out of the pei'son in whom it is vested, only by a conveyance in his own name ; and this cannot be executed by another for him, when it could not, in law, be executed by himself. A conveyance *in the name of a person, who was dead at the time, would be a manifest absurdity.
 

 This general doctrine, that a power must be executed in the name of a person who gives it, a doctrine founded on the nature of the transaction, is most usually engrafted in the power itself. Its usual language is, that the substitute shall do that which he is empowered to do, in the name of his principal. He is put in the place and stead of his principal, and is to act in his name. This accustomed form is observed in the instrument under consideration. Hunt is constituted the attorney, and is authorized to make, and execute, a regular bill of sale, in the name of Rousmanier. How, as an authority must be pursued, in order to make the act of the substitute the act of the principal, it is necessary, that this bill of sale should be in the name of Rousmanier; and it would be a gross absurdity, that a deed should
 
 *89
 
 purport to be executed by him, even by attorney, after bis death ; for, the attorney is in the place of the principal, capable of doing that alone which the principal might do.
 

 This general rule, that a power ceases with the life of the person giving it, admits of one exception. . If a power be coupled with an “ interest,” it survives the person giving it, and may be executed after his death. As this proposition is laid down too positively in the books to be controverted, it becomes necessary to inquire, what is meant by the expression, “ a power coupled with an interest?” It is an interest in the subject on which the power is to be *exercised ? or is it an interest in that which is pi-o-duced by the exercise of the power? We hold it to be clear, that the interest which can protect a power, after the death of a person who creates it, must be an interest in the thing itself. In other words, the power must be engrafted on an estate in the thing. The words themselves would seem to import this meaning. “ A power coupled with an interest,” is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. But if we are to understand by the word “ interest,” an interest in that which is to be produced by the exercise of the power, then they are never united. The power, to produce the interest, must be exercised, and by its exercise, is extinguishedi The power ceases, when the interest commences,' and therefore, cannot, in accurate law language, be said to be “ coupled” with it.
 

 But the substantial basis of the opinion of the court on this point, is found in the legal reason of the principle. The interest or title in the thing being vested in the person who gives the power, remains in him, unless it be conveyed with the power, and can pass out of him only by a regular act in his own name. The act of the substitute, therefore, which, in such a case, is the act of the principal, to be legally effectual, must be in his name, must be such an act as the principal himself would be capable of performing, and which would be valid, if performed by him. Such a power necessarily ceases with the life of *the person making it. But if the interest, or estate, passes with the power, and vests in the person by whom the power is to be exercised, such person acts in his own name. The estate, being in him, passes from him, by a conveyance in his own name. He is no longer a substitute, acting in the place and name of another, but is a principal, acting in his own name, in pursuance of powers which limit his estate. The legal reason which limits a power to the life of the person giving it, exists no longer, and the rule ceases with the reason on which it is founded. The intention of the instrument may be effected, without violating any legal principle.
 

 This idea may be in some degree illustrated by examples of cases in which the law is clear, and which are incompatible with any other exposition of the term
 
 “
 
 power coupled with an interest.” If the word
 
 “
 
 interest,” thus used, indicated a title to the proceeds of the sale, and not a title to the thing to be sold, then a power to A., to sell for his own “benefit, would be a power coupled with an interest; but a power to A., to sell for the benefit of B., would be a naked power, which could be executed only in the life of the person who gave it. Yet, for this distinction, no legal reason can be assigned. Nor is there any reason for it in justice ; for, a power to A., to sell for the benefit of B., may be as much a part of the
 
 *90
 
 contract on 'which B. advances his money, as if the power had been made to himself. If this were the true exposition of the term, then a power to A., to sell for the use of B., inserted in a conveyance to A., of the thing *to *¾0⅝ would not be a power coupled with an interest, and, consequently, could not be exercised, after the death of the person making it; while a power to A., to sell and pay a debt to himself, though not accompanied with any conveyance which might vest the title in him, would enable him to make the conveyance, and to pass a title, not in him, even after the vivifying principle of the power had become extinct. But every day’s experience teaches us, that the law is not, as the first case put would suppose. We know, that a power to A., to sell for the benefit of B., engraf-ted on an estate conveyed to A., may be exercised at any time, and is not affected by the death of the person who created it. It is, then, a power coupled with an interest, although the person to whom it is given had no interest in its exercise. His power is coupled with an interest in the thing, which enables him to execute it in his own name, and is, therefore, not dependent on the life of the person who created it.
 
 [1]
 

 The general rule, that a power of attorney, though irrevocable by the party, during his life, is extinguished by his death, is not affected by . the circumstance, that testamentary powers are executed after the death of the testator. The law, in allowing a testamentary disposition of property, not only permits a will to be considered as a conveyance, but gives it an operation which is not allowed to deeds which have their effect during the life of the person who executes them. An estate given by will may take effect at a future time, or on a future contingency, and in the meantime, descends *to the heir. The power is, necessarily, to be executed after the death of the person who makes it, and cannot exist during his life. It is the intention, that it shall be executed after his death. The conveyance made by the person to whom it is given, takes effect by virtue of the will, and the purchaser holds his title under it. Every case of a power given in a will, is considered in a court of chancery as a trust for the benefit of the person for whose use the power is made, and as a devise or bequest to that person.
 
 [2]
 

 It is, then, deemed perfectly clear, that the power given in this case, is a naked power, not coupled with an interest, which, though irrevocable by Rousmanier himself, expired on his death. It remains to inquire, whether the appellant is entitled to the aid of this court, to give effect to the intention of the parties, to subject the interest of Rousmanier in the Nereus and Industry to the payment of the money advanced by the plaintiff, on the credit of those, vessels, the instrument taken for that purpose having totally failed to effect its object.
 

 This is the point on which the plaintiff most relies, and is that on which the court has felt most doubt. That the parties intended, the one to give, and the other to receive, an effective security on the two vessels mentioned in the bill, is admitted ; and the question is, whether the law of this court will enable it to carry this intent into execution, when the instrument relied on by both parties has failed to accomplish its object. The respondents insist, that there is no defect *in the instrument itself; that
 
 *91
 
 it contains precisely what it was intended to contain, and is the instrument which was chosen by the parties, deliberately, on the advice of counsel, and intended to be the consummation of their agreement. That in such a case the written agreement cannot be varied by parol testimony. The counse, for the appellant contends, with great force, that the cases in which parol testimony has been rejected, are cases in which the agreement itself has been committed to writing ; and one of the parties has sought to contradict, explain or vary it, by parol evidence. That in this case, the agreement is not reduced to writing. The power of attorney does not profess to be the agreement, but is a collateral instrument, to enable the party to have the benefit of it, leaving the agreement still in full force, in its orignal form. That this parol agreement, not being within the statute of frauds, would be enforced by this court, if the power of attorney had not been executed ; and not being merged in the power, ought now to be executed. That the power being incompetent to its object, the court will enforce the agreement against. general creditors.' This argument is entitled to, and has received, very deliberate consideration.
 

 The first inquiry respects the fact. Does this power of attorney purport to be the agreement ? Is it an instrument collateral to the agreement ? Or is it an execution of the agreement itself, in the form intended by both the parties ? The bill states an offer on the part of Rousmanier *to give |.⅜ a mortgage on the vessels, either in the usual form, or in the form of L an absolute bill of sale, the vendor taking a defeasance ; but does not state any agreement for that particular security. The agreement stated in the bill is, generally, that the plaintiff, in addition to the notes of Rousmanier, should have specific security on the vessels ; and it alleges, that the parties applied to counsel for advice respecting the most desirable mode of taking this security. On a comparison of the advantages and disadvantages of a mortgage, and a irrevocable power of attorney, counsel advised the latter instrument, and assigned reasons for his advice, the validity of which being admitted by the parties, the power of attorney was prepared and executed, and was received by the plaintiff as full security for his loans. This is the case made by the amended bill; and it appears to the court, to be a case in which the notes and power of attorney are admitted to be a complete consummation of the agreement. The thing stipulated was a collateral security on the Nereus and Industry. On advice of counsel, this power of attorney was selected, and given as that security. We think it a complete execution of that part of the agreement; as complete, though not as safe an execution of it, as a mortgage would have been.
 

 It is contended, that the letter of attorney does not contain all the terms of the agreement. Neither would a bill of sale, nor a deed of mortgage, contain them. Neither instrument constitutes the agreement itself, but is that for which the *agreement stipulated. The agreement consisted of a loan of money on the part of Hunt, and of notes for its repayment, and of a collateral security on the Nereus and Industry, on the part of Rousmanier. The money was advanced, the notes were given, and this letter of attorney was, on advice of counsel, executed and received as the collateral security which Hunt required. The letter of attorney is as much an execution of tha'' part of the agreement which stipulated a collateral
 
 *92
 
 security, as the notes are an execution of that part which stipulated that notes should be given.
 

 But this power, although a complete security, during the life of Rous-manier, has been rendered inoperative by his death. The legal character of the security was misunderstood by the parties. They did not suppose, that the power would, in law, expire with Rousmanier. The question for the consideration of the court is this : If money be advanced on a general stipulation to give security for its repayment on a specific article; and the parties deliberately, on advice of counsel, agree on a particular instrument, which is executed, but, from a legal quality inherent in its nature, that was unknown to the parties, becomes extinct by the death of one of them ; can a court of equity direct a new security of a different character to be given ? or direct that to be done which the parties supposed would have been effected by the instrument agreed on between them ? This question has been very elaborately argued, and every case has been cited which could be *suPPose<l t° bear upon it. No one of these cases decides the very question now before the court. It must depend on the principles to be collected from them.
 

 It is a general rule, that an agreement in writing, or an instrument carrying an agreement into execution, shall not be varied by parol testimony, stating conversations or circumstances anterior to the written instrument, This rule is recognised in courts of equity as well as in courts of law ; but courts of equity grant relief in cases of fraud and mistake, which cannot be obtained in courts of law. In such cases, a court of equity may carry the intention of the parties into execution, where the written agreement fails to express that intention. In this case, there is no ingredient of fraud. Mistake is the sole ground on which the plaintiff comes into court; and that mistake is in the law. The fact is, in all respects, what it was supposed to be. The instrument taken, is the instrument intended to be taken. But it is, contrary to the expectation of the parties, extinguished by an event not foreseen nor adverted to, and is, therefore, incapable of effecting the object for which it was given. Does a court of equity, in such a case, substitute a different instrument for that which has failed to effect its object ?
 

 In general, the mistakes against which a court of equity relieves, are mistakes in fact. The decisions on this subject, though not always very distinctly stated, appear to be founded on some misconception of fact. Yet some them bear a considerable *analogy to that under consideration. Among these, is that class of cases in which a joint obligation has been set up in equity against the representatives of a deceased obligor, who were discharged at law. If the principle of these decisions be, that the bond was joint, from a mere mistake of the law, and that the court will relieve against this mistake, on the ground of the pre-existing equity, arising from the advance of the money, it must be admitted, that they have a strong bearing on the case at bar. But the judges ¡in the courts of equity seem to have placed them on mistake in fact, arising from the ignorance of the draftsman. In
 
 Simpson
 
 v.
 
 Vaughan,
 
 2 Atk. 33, the bond was drawn by the obligor himself, and under circumstances which induced the court to be of opinion, that it was intended to be joint and several. In
 
 Underhill
 
 v.
 
 Horwood,
 
 10 Ves. 209, 227, Lord Eldon, speaking of cases in which a joint bond has been set up against the representatives of a deceased obligor, says, “the
 
 *93
 
 court bas inferred, from the nature of the condition, and the transaction, that it was made joint, by mistake. That is, the instrument is not what the parties intended in fact. They intended a joint and several obligation ; the scrivener has, by mistake, prepared a joint obligation.”
 

 All the cases in which the court has sustained a joint bond against the representatives of the deceased obligor, have turned upon a supppsed mistake in drawing the bond. It was not until *the case of
 
 Sumner
 
 v.
 
 Powell,
 
 2 Meriv. 36, that anything was said by the judge who determined the cause, from which it might be inferred, that relief in these cases would be afforded on any other principle than mistake in fact. In that case, the court refused its aid, because there was no equity antecedent to the obligation. In delivering his judgment, the master of the rolls (Sir W. GraNt) indicated very clearly an opinion, that a prior equitable consideration, received by the deceased, was indispensable to the setting up of a joint obligation against his representatives ; and added, “ so, where a joint bond has, in equity, been considered as several, there has been a credit previously given to the different persons who have entered into the obligation.” Had this case gone so far as to decide, that “ the credit previously given ” was the sole ground on which a court of equity would consider a joint bond as several, it would have gone far to show, that the equitable obligation remained, and might be enforced, after the legal obligation of the instrument had expired. But the case does not go so far ; it does not change the principle on which the court had uniformly proceeded, nor discard the idea, that relief is to be granted, because the obligation was made joint, by a mistake in point of fact. The case only decides, that this mistake, in point of fact, will not be presumed by the court, in a case where no equity existed antecedent to the obligation, where no advantage was received *by, and no credit given [-*014. to, the person against whose estate the instrument is to be set up. *- Yet, the course of the court seems to be uniform, to presume a mistake, in point of fact, in every case where a joint obligation has been given, and a benefit has been received by the deceased obligor. No proof of actual mistake is required; the existence of an antecedent equity is sufficient. In cases attended by precisely the same circumstances, so far as respects mistake, relief will be given against the representatives of a deceased obligor, who had received the benefit of the obligation, and refused against the representatives of him who had not received it. Yet the legal obligation is as completely extinguished in the one case as in the other; and the facts stated, in some of the cases in which these decisions have been made, would rather conduce to the opinion, that the bond was made joint, from ignorance of the legal consequences of a joint obligation, than from any mistake in fact.
 

 The case of
 
 Landsdowne
 
 v.
 
 Landsdowne
 
 (reported in Mosely), if it be law, has no inconsiderable bearing on this cause. The right of the heir-at-law was contested by a younger member of the family, and the arbitrator to whom the subject was referred decided against him. He executed a deed m compliance with this award, and was afterwards relieved against it, on the principle that he was ignorant of his title. The case does not suppose this fact, that he was the eldest son, to have been unknown to him ; and if he was ignorant of anything, it was of the *law, which gave him, as eldest son, the estate he had conveyed to a younger brother. Yet he
 
 *94
 
 was relieved in chancery against this conveyance. There are certainly strong objections to this decision in other respects ; but, as a case in which relief has been granted on a mistake in law, it cannot be entirely disregarded.
 

 Although we do not find the naked principle, that relief may be granted on account of ignorance of law, asserted in the books, we find no case in which it has been decided, that a plain and acknowledged mistake in law is beyond the reach of equity. In the case of
 
 Lord Irnham
 
 v.
 
 Child,
 
 1 Bro. C. C. 91, application was made to the chancellor to establish a clause, which had been, it was said, agreed upon, but which had been considered by the parties, and excluded from the written instrument, by consent. It is true, they excluded the clause, from a mistaken opinion that it would make the contract usurious, but they did not believe that the legal effect of the contract was precisely the same as if the clause had been inserted. They weighed the consequences of inserting and omitting the clause, and preferred the latter. That, too, was a case to which the statute applied. Most of the cases which have been cited were within the statute of frauds, and it is not easy to say, how much has been the influence of that statute on them.
 

 The case cited by the respondent’s counsel from Precedents in Chancery, *8 no* description; *but it does not appear from that case that the power of attorney was intended, or believed, to be a lien In this case, the fact of mistake is placed beyond any controversy. It is averred in the bill, and admitted by the demurrer, that “ the powers of attorney were given by the said Rousmanier, and received by the said Hunt, under the belief that they were, and with the intention that the should create, a specific lien and security on the said vessels.” We find no case which we think precisely in point; and are unwilling, where the effect of the instrument is acknowledged to have been entirely misunderstood by both parties, to say, that a court of equity is incapable of affording relief. The decree of the circuit court is reversed ; but as this is a case in which creditors are concerned, the court, instead of giving a final decree on the demurrer, in favor of the plaintiff, directs the cause to be remanded, that the circuit court may permit the defendants to withdraw their demurrer, and to answer the bill.
 

 Decebe. — This cause came on to be heard, on the transcript of the record of the circuit court of the United States for the district of Rhode Island, and was argued by counsel: on consideration whereof, this court is of opinion, that the said circuit court erred, in sustaining the demurrer of the defendants, and dismissing the bill of the complainant: it is, therefore, d-ecree<l and ordered, that the decree of the said circuit *court in this' case, be and the same is hereby reversed and annulled. And it is further ordered, that the said cause be remanded to the said circuit court, with directions to permit the defendants to withdraw their demurrer, and to answer the bill of the complainants.
 

 [1]
 

 See Cassidy
 
 v.
 
 McKenzie, 4 W. & S. 208 ; Wells
 
 v.
 
 Sloyer, 1 Clark (Pa.) 516.
 

 [2]
 

 See Taylor v. Benham, 5 How. 233.